IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | |
|---|---|
| MICHAEL T. SHIVERS, | ) Civil Action No. 3:09-3357-MBS-JRM |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) **REPORT AND RECOMMENDATION** |
| SOUTH CAROLINA DEPARTMENT OF | ) |
| CORRECTIONS, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| ——————————————————— | ) |

        Plaintiff, Michael T. Shivers ("Shivers") filed this action on December 30, 2009. He alleges

claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq.

("Title VII").[1]  Defendant, the South Carolina Department of Corrections ("SCDC") filed a motion

for summary judgment on November 11, 2010. Shivers filed a response on December 14, 2010, and

SCDC filed a reply on January 7, 2011.

## FACTS

1.      Shivers, a white male, began working for SCDC in September 1996 as a Correctional Officer.

        In July 1999, Shivers was promoted to the position of Corporal. He was promoted to the

        position of Sergeant in November 2002.

2.      During the relevant time period, approximately February 2007 through September 2008 (at

        which time Shivers was demoted from Sergeant to Officer), Shivers was assigned to the A2

---

        [1]Pretrial matters in this case were referred to the undersigned pursuant to Rule 73.02(B)(2)(g)
DSC. Because this is a dispositive motion, this report and recommendation is entered for review by
the court.

night shift at the Kirkland Reception and Evaluation Center ("Kirkland"). Shriver's direct supervisor was Captain Antony Preacher ("Preacher"), a black male. Preacher reported to Major Samuel Latta ("Latta"), a black male. Latta reported to Warden Bernard McKie, a black male.

3.    Prior to 2007, Shivers had favorable evaluations and did not have discipline problems. <u>See</u> Shivers Dep. 171.

4.    On February 12, 2007, while he was on duty, Shivers filled out a "Medical Annex Sick Call List." Robin Gracien ("Gracien")[2] Aff., Para. 6. The form is used to identify inmates at Kirkland who have requested medical attention. On the form, Shivers wrote the names of other SCDC employees who worked on the A-2 Shift. In the column of the form (referred to herein as the "Sick Call List") designated for comments, Shivers wrote derogatory comments for each co-worker he had listed. The comments included physical ailments such as "swollen tongue" and "jock itch" and venereal diseases such as herpes, and genital warts, as well as negative personal comments such as "All Around F[*****] Up, ""too man[n]ish for a female," and "Spineless Little S[***]." At the bottom of the form, it was signed "Sincerely Yours, the Sick Call Bandit" and it was written "[t]hose who do evil to others will come to know me well." On the envelope for the form it was written "ATTENTION: A2 SHIFT (Personal and Confidential) <u>To Be Opened Immediately</u>!" Gracien Aff., Ex. 2.

---

[2]Gracien is the Chief of the Employee Relations Branch in the Division of Human Resources for SCDC. <u>See</u> Gracien Aff., Para. 1. Her affidavit contains personal employment information for SCDC employees other than Shivers, and thus was filed under seal pursuant to the Stipulated Protective Order entered in this action.

5.    Another employee on the shift discovered the envelope and the form and turned it into the shift supervisor.  Due to the similarity between the handwriting on the Sick Call List and Shivers' handwriting on other documents, Kirkland administration asked Shivers if he had written the names and negative comments on the form.  Shivers denied doing so and the matter was referred to SCDC central offices for investigation.  See Gracien Aff., Ex. 2.

6.    During the investigation, which took place in March and April 2007, Shivers was called in and asked if he wrote the names and comments on the form.  Shivers Dep. 24.  He again denied any involvement.  Shivers Dep. 24.  The investigator requested that Shivers complete a polygraph (or lie detector) examination and Shivers agreed.  During the polygraph test, Shivers was asked numerous times if he was the person who filled out the Sick Call List.  Each time, he replied, "no."  See Shivers Dep. 25.  The results of the polygraph examination indicated deception by Shivers.  Gracien Aff., Ex. 2.

7.    Based on the polygraph examination and comparison of Shivers' handwriting to that on the sick call list, the investigator concluded that Shivers was the author of the derogatory comments and referred the matter back to Kirkland and Warden McKie for corrective action.  Warden McKie suspended Shivers for twenty-four hours without pay for "unprofessional conduct," on May 24, 2007.  Gracien Aff., Ex. 2.  Shivers did not contest or grieve the corrective action.[3]

---

[3]Shivers no longer denies writing the Sick Call List.  He testified that, during the polygraph, he denied writing it because he was scared of losing his job. Also, he said he lied to the investigator because he was scared.  Shivers admits he deserved to be disciplined for the Sick Call Sheet.  Shivers Dep. 25-26, 28.

8.    While at work on October 27, 2007, Shivers received an anonymous phone call telling him to call another phone number.  Shivers called the number from a work phone and heard a message from a voice he recognized as a co-worker at SCDC.  Shivers Dep. 31-32.  The message referenced a "racist hotline" and contained jokes about Jewish people (the alleged person who recorded the message is Jewish).  Shivers, who was a supervisor at the time, admitted that the message was not appropriate for the workplace, and he did not report the incident that day.  Shivers Dep. 34.  Kirkland administration learned about the matter and issued written warnings to Shivers and other employees who called the number from work.  See Gracien Aff, Para. 7 and Ex. 3; Shivers Dep. 31, 34.  Shivers did not grieve or contest this corrective action.

9.    In approximately November 2007, Shivers, Officer Eric Laux (white male) and Lieutenant Gibson (black male) responded to a cell where an inmate had cut himself and was bleeding.  Shivers Dep. 214-218.  Shivers asked Gibson, his superior officer, if he should put the inmate in restraints.  Gibson instructed Shivers not to use restraints and ordered Shivers and Laux to go inside the cell and take the inmate to the infirmary.  They complied and Gibson left.  The inmate charged the officers and Laux accidently caused Shivers to injure his back on a cell door.  Sergeant Barnes (black female) wrote an incident report alleging improprieties on the part of Shivers (that he agitated the inmate), but she was not present when the events transpired.  Preacher, Latta, and Major Jackson (black male) attempted to charge him with a forced cell movement, and Jackson had a charge prepared when Shivers met with him.  Once it was discovered that Gibson ordered Shivers to leave the restraints off, the charges

were dropped and Barnes wrote a new incident contradicting the first one.  Shivers Dep. 214-218.

10.    On March 8, 2008, Preacher ordered Shivers to distribute Special Olympic Buttons and collect donations of one dollar per button during his shift briefing the following day.  Shivers asked that Preacher store the buttons at Kirkland in a locked file cabinet, but Preacher denied the request and ordered Shivers to take the buttons home.  Upon arriving at work on March 9, 2008 for his shift (which begins at approximately 6 p.m. and ends at approximately 6 a.m. the following morning), Shivers could not locate the buttons inside his vehicle and believed they had been stolen.  He reported this to Preacher, who instructed him to file a police report and an incident report.  Shivers completed an incident report, but did not file it during his shift.[4]    He claims he was unable to file a police report because he was at work.  Upon arriving home on the morning of March 10, 2008, Shivers discovered the buttons inside his home and realized he must have brought them inside.  At that point, he determined that it was no longer necessary to file a police report.  He brought the buttons to Kirkland when he arrived for the next shift.  See Shivers Dep. 37-39, 41-45; Gracien Aff., Ex. 4.

---

[4]In his memorandum in opposition to summary judgment, Shivers asserts that he filed an incident report concerning the missing bottons on the night (March 9) he was ordered to do so. Plaintiff's Opp. Mem. at 3.  In his deposition, he testified that he filed an incident report the night he was told to do so.  Shivers Dep. 42-43.  In an incident report he filed later (discussed further below), however, he stated that he did not see the need to file a police report because he found the buttons and turned them back in and that Preacher did not order him to write an incident report, that he wrote one on his own that night, but "forgot to turn it in until the next day."  Gracien Aff., Ex. 17.  The incident report completed by Shivers concerning the button incident has in the "Supervisor's Comments" section the statement "This Report Was Received At Formation 6:10pm 10 March 08." Gracien Aff., Ex. 4.

11.  On March 20, 2008, Shivers met with Preacher about the button incident.  Preacher expressed dissatisfaction with Shivers' conduct and job performance.  During the meeting, Preacher told Shivers that he was "like a cancer to this shift."  Shivers asked why, and Preacher replied "You don't hang out with anybody, or talk to anybody, other than white people."  Shivers Dep. 114-115.  After Shivers asked Preacher why he brought race into the conversation, Latta became quiet and did not make any further comments.

12.  Shivers filed an incident report outlining Preacher's alleged racial remarks and complaining that Preacher was targeting him in an attempt to force him out of his position.  Shivers Dep. 114-115; Gracien Aff., Ex. 17.

13.  Major Latta forwarded Captain Preacher's referral for corrective action on the button incident to Warden McKie.  Warden McKie issued a written warning to Shivers on approximately March 21, 2008, for "refusal to carry out oral directive of supervisor."  Gracien Aff., Ex. 4; Shivers Dep. 46.  Shivers did not grieve or contest the corrective action.

14.  On April 14, 2008, Shivers filed a harassment/hostile work environment complaint to the SCDC Employee Relations Branch.   The complaint specifically identified the remarks made during the March 20, 2008 meeting and referenced Shivers' earlier incident regarding the same.  See Shivers Dep. 45-46; Gracien Aff., Ex. 17, 23.

15.  On April 16, 2008, Gracien responded in writing to Shivers' complaint, advising him that the actions were not grievable and did not warrant further action from her office.  She informed Shivers that she had spoken to Kirkland Associate Warden Michael McCall who intended to meet with Shivers to discuss his concerns.  Gracien Aff., Paras. 25-26; Ex. 18.

16.     Shivers went to McCall's office for a meeting, but was called by Latta and Preacher into Latta's office.  Latta and Shivers (Preacher left the office) began to talk about multiple topics ranging from gas prices to speed limits, but did not address the race issue.  Latta stated to Shivers, "If you want to continue to move up around here, don't be going back up to headquarters anymore."  Shivers Dep. 45-56, 182-183.  Shivers did not meet with McCall after that, did not make any additional attempts to meet with McCall, and did not follow up on his complaint.  Shivers Dep. 183-184.  On April 23, 2010, Shivers called Lieutenant Jerome Gibson ("Gibson"), the supervisor in charge of scheduling, regarding a leave request.  Gibson told Shivers, "I don't have to explain a g [******] mother f[******] thing to you."  He repeated the profanity, and Shivers terminated the call.  When Shivers attempted to call back later, Gibson again repeated the profanity.  Shivers submitted an incident report concerning the matter.  When Shivers was summoned to a conference with McKie regarding the incident, Preacher, not Gibson, was present.  McKie stated that it did not matter what Shivers said, because he would automatically believe Preacher instead.

17.     In an incident report, Gibson wrote that when he informed Shivers that his leave request had been denied, Shivers got upset and insulted and threatened Gibson and then hung up the phone.  Gibson claims that Shivers called back later, got angry, and hung up after hearing Gibson's response.  Gibson referred the incident for corrective action on the grounds of unprofessional conduct.  Gracien Aff., Ex. 5.

18.    Shivers accidently broke the seal on his pepper spray gas canister on April 25, 2010.[5]  He immediately filed an incident report concerning the incident and submitted it to Preacher who instructed Shivers to have the canister weighed.  Shivers testified he had the canister weighed and recorded the weight on a piece of paper.  He then asked Preacher to give him the earlier incident report so he could record the weight.  Instead of producing the incident report, Preacher and Latta called Shivers into Latta's office and interrogated him for two hours concerning the earlier incident with Gibson.  Preacher charged Shivers with a corrective action for the gas canister, which he forwarded to McKie along with the alleged Gibson incident.  Shivers Dep. 58-71.

19.    In his incident report, Preacher wrote that Shivers gave him an incident report about the canister and he told Shivers he needed to have the canister weighed.  He wrote that Shivers took the report and turned it into Control, but failed to have the canister weighed.  Additionally, Preacher wrote that both Control officers, when asked if Shivers asked them to weigh the canister, replied "no."  The incident report completed and signed by Shivers does not have a weight on it.  Gracien Aff., Ex. 5.

20.    McKie considered the Gibson incident and the pepper spray incident together and suspended Shivers for twenty-four hours.  Gracien Aff., Para. 9, Ex. 5; see Shivers Dep. 56.  Shivers did not grieve or contest this corrective action.

21.    Each unit at Kirkland is required to perform shakedowns of five inmate cells on a daily basis.  A shakedown is supposed to be performed by two officers.  One officer searches and guards

---

[5]The canister, which officers are supposed to carry while on shift, was equipped with a seal to indicate if any gas was used.  An officer is supposed to write an incident report and have the canister weighed if the seal is broken.

the inmates while the other officer performs a search of the cell for contraband (tobacco, pornography, weapons, etc).  Shivers Dep. 71.  The officers are required to submit a "Shakedown/Search Report" to document the shakedowns.  Shivers Dep. 75, Ex. 6   The officer in the unit has the discretion of choosing which cells to shakedown.  Shivers Dep. 72.  Shivers states that on a regular basis, the shift was instructed by Preacher, Gibson, or the shift supervisors to fill in the form ahead of time with information, such as the cells intended to be searched, the inmates' names, and the units officers's signature, as a "routine, time-saving" practice.  Shivers Dep. 75-79, 89, Ex. 6.  The shakedown report is not complete until it had both officers' signatures.  The second officer, usually assigned to the yard, then only has to come into the unit to perform the shakedowns and sign the shakedown report.  See Shivers Dep. 76-77, 84-85, 239-240.

22. On August 20, 2008, during an initial security check, Shivers saw excess toilet paper in cell number 28, which he confiscated from the inmates without opening the cell.  Shivers Dep. 80.  Shivers filled out a shakedown report in advance and chose cell numbers 28-32 due to the contraband found earlier in cell 28.  Shivers also documented the excess toilet paper and disposition of the toilet paper on the shakedown report.  Shivers Dep. 80-81, Gracien Aff., Ex. 6.  He filled in his name under section 1 and signature under section 8, drawing a large diagonal slash to indicate where the other officer's name and signature would be recorded.  Shivers Dep. 80, 86, 239-240; Gracien Aff., Ex. 6.

23. While Shivers was away from his desk passing out mail, Preacher entered Shivers' office and took the shakedown report off the desk.  Preacher then sent Officer Caton back to the unit with instructions to shakedown five cells other than those selected by Shivers.  Shivers and

Caton performed the shakedowns and submitted a new shakedown report. Shivers Dep. 82-86.

24. The same day, Preacher filled out an incident report stating that Shivers would be charged with falsifying a search report. Preacher wrote that he found the sheet with Shivers' signature; when asked if he did the shakedowns, Shivers said yes; Shivers stated Laux was going to assist him; and then Shivers said he did the shakedown and found evidence. Gracien Aff., Ex. 6.

25. Approximately a week after the August 20, 2008 shakedown incident, McKie and Preacher summoned Shivers to McKie's office concerning a petition that was submitted to McKie. The petition was drafted by Sergeant Sells and Officer Stan Rawls ("Rawls") and outlined safety concerns about a practice of pulling over fifty inmates out of their cells for a church service. The concern was that two officers had to watch over fifty unsecured inmates and protect the civilian service leader as well. At least thirteen officers and six sergeants (including Shivers) signed the petition. Rawls Dep. 127-130. During the meeting, McKie expressed that he did not like Shivers and stated that Shivers was "part of a group [and] that he's going to make [it] his mission to fire everybody in this group." Shivers Dep. 105-108.

26. On September 9, 2008, Preacher charged Shivers with "Falsification of Documents" and McKie was listed as the reprimanding authority. Shivers was suspended for twenty-four hours and demoted from sergeant to officer (which included a reduction in salary). McKie Dep., Ex. 4.

27. Shivers submitted a grievance, contesting the corrective action. He testified that he attached a copy of his earlier harassment/hostile work environment complaint he filed with the SCDC

Employee Relations Branch to the new grievance. He admits that he did not raise anything about discrimination on the grievance form. During the grievance process, Shivers was interviewed by an SCDC attorney, Wesley Jacobs. Shivers asserts that he complained of racial discrimination during the interview. Shivers Dep. 196-198; <u>see</u> Gracien Aff., Ex. 19.

28.    Additionally, Shivers submitted a letter to the Director of SCDC in which he stated he believed the charge of falsification of documents and demotion were a result of retaliation for an anonymous letter.[6] Gracien Aff., Ex. 19.

29.    Shivers filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the South Carolina Human Affairs Commission ("SCHAC") on January 23, 2009. In his charge, Shivers alleged discrimination based on sex and race, and a claim for retaliation. He wrote he was subjected to disparate terms and conditions starting April 30, 2007, because he was "accused of writing a letter to Management detailing wrongdoings of Respondent's supervisors." He also claimed he was demoted, but similarly-situated black females who were accused of wrongdoing were not. Gracien Aff, Ex. 20.

30.    SCHAC issued a right to sue notice on November 16, 2009, and the EEOC issued a right to sue notice on December 15, 2009. Gracien Aff., Exs. 21 and 22.

### STANDARD FOR SUMMARY JUDGMENT

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). <u>See also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986). The facts and inferences

---

[6]Presumably, the "anonymous letter" is the Sick Call List. <u>See</u>, <u>e.g.</u>, Shivers Dep. 200-201.

to be drawn from the evidence must be viewed in the light most favorable to the non-moving party.

Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991).  A fact is deemed "material" if proof of its

existence or non-existence would affect disposition of the case under applicable law.  Anderson, 477

U.S. 242 at 248. "Genuineness means that the evidence must create fair doubt; wholly speculative

assertions will not suffice."  Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir.

1985).

     The defendant "bears the initial burden of pointing to the absence of a genuine issue of

material fact."  Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  If defendant carries this burden, "the burden then

shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact."

Id. at 718-19 (citing Anderson, 477 U.S. at 247-48).

     "[O]nce the moving party has met his burden, the nonmoving party must come forward with

some evidence beyond the mere allegations contained in the pleadings to show there is a genuine

issue for trial."  Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992).  The party

asserting that a fact cannot be or is genuinely disputed must support the assertion by: (1) citing to

particular parts of materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations (including those made for purposes of the motion

only), admissions, interrogatory answers, or other materials; or (2) showing that the materials cited

do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce

admissible evidence to support the fact.  Fed. R. Civ. P. 56(c) (1)(A-B).

     Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment.

Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547 (5th Cir. 1987) and Evans v. Technologies

12

Applications & Servs. Co., 80 F.3d 954 (4th Cir. 1996). If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials-including the facts considered undisputed-show that the movant is entitled to it; or (4) issue any other appropriate order. Fed. R. Civ. P. 56(e)(1-4).

## DISCUSSION

Shivers alleges that SCDC discriminated against him based on his race and sex in violation of Title VII. He also appears to assert a claim for harassment/hostile work environment. Additionally, Shivers claims that SCDC retaliated against him after he complained about racial remarks and preferential treatment accorded to his black male and female counterparts. SCDC contends that it is entitled to summary judgment because: (1) Shivers' allegations and testimony demonstrate, pursuant to Lightner v. City of Wilmington, 545 F.3d 260 (4th Cir. 2008), that any disparate or negative treatment he received was caused by his own misconduct beginning with the Sick Call List; (2) Shivers is unable to establish a prima facie case for his claims under Title VII; (3) Shivers cannot establish a prima facie case for disparate discipline; (4) Shivers cannot establish a prima facie case of harassment/hostile work environment; (5) Shivers cannot establish a prima facie case of retaliation; (6) SCDC has asserted legitimate, nondiscriminatory reasons for its actions; and (7) Shivers cannot establish that SCDC's legitimate, nondiscriminatory reasons are pretextual.

A.    Disparate Treatment

SCDC argues that as a threshold matter it is entitled to summary judgment because Shivers' allegations and testimony demonstrate that any disparate or negative treatment he received was

caused by his own misconduct beginning with his list of defamatory comments (the Sick Call List). Shivers argues that this case is distinguishable from <u>Lightner</u> because the employee in that case went to great lengths to state that the reason for the employer's action was something other than a protected attribute under Title VII, including asserting such in his appellate brief and memorandum in opposition to summary judgment, and Lightner had no other reasonable evidence supporting a claim of race discrimination. In contrast, Shivers argues he has not asserted that SCDC's conduct was in direct retaliation for the Sick Call List, but has alleged that SCDC's conduct was motivated by race discrimination, gender discrimination, and retaliation for his hostile work environment complaint. He claims that the Sick Call List just brought him to his supervisors' attention and then they targeted him because of race and gender.

Where a plaintiff alleges discrimination claims under Title VII and simultaneously alleges that the true motivating factor before the employer's allegedly wrongful actions was something other than a prohibited factor under Title VII, summary judgment is appropriate as to the Title VII claims. <u>See</u> <u>Lightner</u>, 545 F.3d at 261, 263-264. The plaintiff in <u>Lightner</u>, a police officer, claimed his employment was terminated because of his race and gender, and also because of his internal investigation regarding other officers' failure to report automobile accidents. <u>Id.</u> at 262. The Fourth Circuit held that "Lightner's acknowledgment that he was fired to stop his internal investigation negates his claims of race and gender discrimination. Consequently, his suspension, however, wrongful, is not actionable under Title VII and the defendants are entitled to summary judgment." <u>Id.</u> at 264.

14

Prior to the filing of this action, Shivers repeatedly asserted that his disciplinary actions were taken because of the Sick Call List.  In a letter signed by Shivers' father dated September 16, 2008, which Shivers and his father appear to have co-authored (see Shivers Dep. 208), it was written:

> Approximately two years ago, Michael was falsely accused of writing an anonymous letter[7] blowing the whistle on corruption at Kirkland Institute, and was forced, through intimidation, to submit to a polygraph to prove his innocence as regards the matter.
>
> Despite passing the aforementioned polygraph,[8] Michael has suffered constant harassment and intimidation, bordering on psychological warfare, from persons, and subordinates of persons, adversely affected by aforementioned anonymous letter.

Gracien Aff., Ex. 19.  The letter further states:

> Michael received a questionable charge of misconduct, and was summarily demoted in rank during an interview with (Warden McKie) during which interview said warden [sic] once again attempted to intimidate Michael into admitting involvement as regards the aforementioned anonymous letter.

Id.  Shivers, in his own letter to the Director of SCDC dated November 7, 2008, stated:

> I...honestly consider Captain Preacher's false allegation against me to be nothing less than part of on-going [sic] willful, malicious retaliation against me resulting from his personal suspicion that I, in some way, was party to a certain anonymous letter, apparently critical of Kirkland administration, forwarded to your office approximately two years ago.

Gracien Aff., Ex. 19.

Additionally, in his EEOC complaint, Shivers wrote that the reason for his disparate treatment was that he "was accused of writing a letter to Management detailing wrongdoings of Respondent's supervisors."  Gracien Aff., Ex. 20.  He also claims that the alleged harassment and disparate

---

[7]Shivers testified that the "letter" is the Sick Call Sheet.  Shivers Dep. 29.

[8]As noted above, the polygraph actual indicated deception.  Additionally, Shivers has now admitted to being the author of the Sick Call List.

treatment began on April 30, 2007, which coincides with the time period of SCDC's investigation of the Sick Call List. Id. He asserts in his opposition memorandum that the alleged mistreatment began in 2007. Plaintiff's Opp. Mem. at 2.

In his deposition, Shivers testified that the Sick Call List brought him to his employer's attention and motivated later corrective actions. Shivers Dep. 29; 138 (Shivers: "Every time I would ask [Captain Preacher] what his problem was, he would always bring up the sick call sheet."); 170 (Shivers: "I believe that it all started over the sick call sheet."); 171-172 (Shivers: "As I said before, I had ten and a half years with all favorable evaluations, no writeups. After the sick call sheet incident, I could do nothing right around there.").[9]

The time period of Plaintiff's alleged unfair treatment also tracks his allegations that the alleged harassment and discrimination began when he wrote the Sick Call List. Shivers testified that the alleged harassment began in"2007, right around the time of" the sick call sheet. Shivers Dep. 120-121.

Even if this case is distinguishable from Lightner, Shivers fails to establish a claim for disparate treatment. Title VII makes it "an unlawful employment practice for an employer--(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may proceed under ordinary principles of proof using direct or indirect evidence, or, in the

---

[9]In his opposition memorandum, Shivers also attempts to tie his alleged treatment to a change in supervisor, claiming the campaign against him "began around the time Preacher was promoted from Lieutenant to Captain." Plaintiff's Opp. Mem. at 2. SCDC, however, has provided that Preacher was promoted from Lieutenant to Captain on February 17, 2006 (see Gracien Supplemental Aff., Para. 2 and Ex. A.), more than a year before any of Shivers' disciplinary actions.

absence of direct proof of a defendant's intent to discriminate, a plaintiff can employ the scheme

outlined in <u>McDonnell Douglas v. Green</u>, 411 U.S. 792 (1973) to establish a prima facie case of

discrimination by offering proof that:

> (1)     he is a member of a protected class;
>
> (2)     he was performing his job in a satisfactory manner;
>
> (3)     he was subjected to an adverse employment action; and
>
> (4)     the alleged adverse action occurred under circumstances that raise a
>         reasonable inference of unlawful discrimination.

<u>See</u> <u>Holland v. Washington Homes, Inc.</u>, 487 F.3d 208, 214 (4th Cir. 2007); <u>White v. BFI Waste</u>

<u>Servs., LLC</u>, 375 F.3d 288, 295 (4th Cir. 2004); <u>McDonnell Douglas</u>, 411 U.S. at 802.  <u>McDonnell</u>

<u>Douglas</u> provides that, once a plaintiff establishes a prima facie case, the burden shifts to the

employer to articulate a legitimate, non-discriminatory basis for the challenged employment action.

<u>McDonnell Douglas</u>, 411 U.S. at 802.  If the employer provides the required evidence of a

nondiscriminatory reason for the action, the plaintiff must then show that the proffered reasons were

not the true reasons for the employment action, but were a pretext for discrimination.  <u>Id.</u> at 804; <u>see</u>

<u>also Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 147 (2000).

> (1)     <u>Prima Facie Case</u>

SCDC does not appear to address Shivers' disparate treatment prima facie case.  For

purposes of summary judgment, the undersigned assumes that Shivers has established a prima facie

case of disparate treatment as to the alleged adverse actions of the twenty-four hour suspension for

the Gibson leave incident combined with the pepper spray canister incident, and his demotion after

the false reporting/shakedown incident.

(2)    <u>Legitimate, Nondiscriminatory Reasons/Pretext</u>

SCDC has articulated legitimate, nondiscriminatory reasons for each of the alleged adverse employment actions.  <u>See</u> Defendant's Motion for Summary Judgment at 29-32.  In particular, as to the Gibson leave incident, SCDC provides that Gibson reported that Shivers got into a verbal altercation with him concerning the leave issue.  <u>See</u> Gracien Aff., Ex. 5.[10]  SCDC provides that, as to the pepper spray canister incident, Shivers failed to have the canister weighed and fill out the appropriate paperwork.  As to the shakedown report issue, SCDC provides that Shivers filled out the shakedown form and signed it, but had not shaken down the cells in question. SCDC provides that Shivers was demoted and received a twenty-four hour suspension for his behavior based on his substantial history of misconduct.  Shivers appears to dispute certain parts of these incidents.  He claims Gibson used profanity towards him and was the one who was verbally abusive (not Shivers), and that Preacher would not give him the incident report back to put the canister weight on it.  Shivers has, however, presented nothing to show that McKie, who was the ultimate decision maker who issued the corrective actions, had any reason to doubt Gibson's report or Preacher's report (in which Preacher stated that the two Control officers denied that Shivers had the canister weighed).  Further, Shivers' incident report about the pepper spray canister does not have a weight on it.  <u>See</u> Gracien Aff., Ex. 5.  Shivers claims that he should not be charged with submitting a false report because he was following the procedure he was told to follow and because he never actually submitted the form (rather that Preacher took it from his desk).  He, however, does not dispute that he filled out the report and signed it without doing the shakedown.  Further, in his grievance of his

_____

[10]Defendant, in its motion for summary judgment, refers to Responses to Request for Admission, however no such documents have been filed with the court.

demotion, he described the incident as an "honest mistake" and stated that "no one showed me how to fill out the form." Gracien Aff., Ex. 19. Shivers fails to show that SCDC's articulated reasons for his suspensions or demotion were false or were not the real reasons for the actions. See, e.g., Hawkins v. PepsiCo, Inc., 203 F.3d 274 (4th Cir. 2000); Kun v. Berkeley County Gov't, 214 F. Supp.2d 559, 566 (D.S.C. 2001), aff'd, 32 Fed. Appx. 689, 2002 WL 570670 (4th Cir. Apr. 17, 2002)(employee cannot establish pretext by simply contesting the merits of the disciplinary actions). Federal Courts "do not sit as a 'super-personnel department weighing the prudence of employment decisions' made by the defendants." Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 272 (4th Cir. 2005), citing DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir.1998); see also Rowe v. Marley Co., 233 F.3d 825, 831 (4th Cir. 2000)("The decision to discharge [plaintiff] and retain [other employees] is the kind of business decision that we are reluctant to second-guess."); see also Swanson v. General Servs. Admin., 110 F.3d 1180, 1186 (5th Cir. 1997)(holding that "[t]he pretext question is not a question whether [the plaintiff] 'considered himself' late, but whether [the employer] considered [the plaintiff] late when he decide to charge [the plaintiff] with annual leave for his tardiness").

Shivers also argues he has shown pretext based on the testimony and statements of other white SCDC officers who described a "racial atmosphere." Rawls testified that black officers referred to each other as "n*****s" at work and referenced white employees as "white boys" or "crackers." Rawls Dep. 43. He also testified that Shivers was excluded from sergeant-type activities and kept out of the loop. Rawls Dep. 46-47. Jason Gilbert, a former SCDC employee, testified that he left SCDC because of a poor work environment, reverse discrimination, getting less desirable assignments than black and/or female employees, and being written up for little or petty things.

Gilbert Dep. 9-13.  Laux wrote that he was summoned from far away at Kirkland by Preacher to refuel a vehicle, while two black female sergeants (who were close by) sat around and giggled.  He also wrote that in August 2008 he was outside a supervisor's door which was slightly open when he overheard Preacher inside stating that "we have to get rid of those two white boys...Shivers and Rawls."  Laux Dep. Exs. 2 and 3.  In his deposition, however, Laux testified that he did not hear any of the conversation which occurred before that, had no idea what the context was, and heard nothing after the statement.  He was unsure whether this occurred in July or August or what part of the month.  Laux Dep. 42-44.  These statements, however, do not show that the reasons SCDC gave for its actions are false or that Shivers' race and/or sex were the reason for the adverse actions.

As is discussed further below, Shivers has not shown disparate discipline.  He also fails to show that he was subjected to a hostile work environment.

B.    <u>Mixed-Motive</u>

In his memorandum in opposition to summary judgment, Shivers argues that even if the Court finds that the analysis of <u>Lightner</u> applies, he should be allowed to proceed under a mixed-motive analysis.  He claims he has established that race and/or gender were a motivating factor for SCDC's treatment toward him.  Plaintiff's Opp. Mem. at 11.  SCDC argues that Shivers cannot proceed under a mixed-motive theory, as there is no evidence that race or gender were motivating factors in his demotion.

Under the "mixed-motive" framework, a plaintiff must offer sufficient evidence of discrimination so that a reasonable jury could conclude that discrimination was a motivating factor for the adverse employment action, that is, a protected trait "actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome."  <u>Hill v. Lockheed Martin</u>

Logistics Mgmt., Inc., 354 F.3d 277, 286 (4th Cir. 2004). Once the plaintiff has made a prima facie case of discrimination, "the employer can avoid liability by proving that it would have made the same decision in the absence of the discriminatory motivation." Worden v. SunTrust Banks, Inc., 549 F.3d 334, 342 (4th Cir. 2008).

Shivers has not offered sufficient evidence of discrimination based on race or sex such that a jury could reasonably conclude that discrimination was a motivating factor in the adverse employment action. McKie made the decision to demote Shivers. He testified that his decision was based on the offense Shivers committed and Shivers' prior disciplinary history. McKie Dep. 84, 114. Shivers has offered no evidence that race or gender factored into McKie's decisions to suspend or demote him. In his deposition, Shivers admitted that McKie never made any racial statements during any of their meetings. Shivers Dep. 135. Although Shivers alleges statements he perceived as racial, he fails to provide a link between these alleged statements and the alleged adverse actions.

    C.    Disparate Discipline

Shivers appears to allege that he was disciplined more severely than black and/or female similarly-situated employees. SCDC contends that Shivers cannot establish his prima facie case because the co-workers identified by Plaintiff are not similarly situated, and their disciplinary measures were not comparable. In particular, SCDC argues that it has a progressive disciplinary scheme and none of the alleged comparators had as prolific a disciplinary history as Shivers nor did the comparators have a similar combination of offenses.

To establish a prima facie case of disparate discipline, a plaintiff must show "(1) that plaintiff engaged in prohibited conduct similar to that of a person of another race, color, sex, religion, or national origin, and (2) that disciplinary measures enforced against the plaintiff were more severe

21

than those enforced against the other person." Lightner v. City of Wilmington, N.C., 545 F.3d 260 (4th Cir. 2008), citing Moore v. City of Charlotte, 754 F.2d 1100, 1105-06 (4th Cir. 1985) (adapting the McDonnell Douglas framework for the employee discipline context).

Shivers fails to establish a prima facie case of disparate discipline because he has not shown that he was subjected to disciplinary measures that were more severe than those measures enforced against other similarly- situated black and/or female employees. Shivers apparently earlier identified a number of persons who were allegedly similarly situated to him.[11] In his opposition memorandum, however, he only discussed two black female employees, E.B. and N.W., who he claims were similarly situated. He asserts that both of these employees were charged with falsification of documents, but were not demoted as he was.

In making a comparison of a plaintiff's treatment to that of employees outside the protected group, a plaintiff must show that the comparables are similarly situated in all relevant respects. See Mitchell v. Toledo Hospital, 964 F.2d 577 (6th Cir. 1992); see also Lanear v. Safeway Grocery, 843 F.2d 298 (8th Cir. 1988)(plaintiff must prove that he and non-protected employee were similarly situated in all respects and the other employee's acts were of comparable seriousness to his own); see also Heyward v. Monroe, 166 F.3d 332, 1998 WL 841494 (4th Cir. Dec. 7, 1998)(unpublished)(employees similarly situated only if they "dealt with the same supervisor, [were] subject to the same standards and...engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." (citations omitted)), cert. denied, 527 U.S. 1036 (1999); Smith v. Stratus Computer, Inc., 40 F.3d 11

---

[11]In its motion for summary judgment, SCDC discusses nine black sergeants (four of which are female) who Shivers alleged were disciplined less severely. Defendant's Motion for Summary Judgment at 19-23.

(1st Cir. 1994)(in disparate treatment cases, employees must be similar in "all relevant aspects" including performance, qualifications, and conduct)(citation omitted), cert. denied, 514 U.S. 1108 (1995); see also Bogren v. Minnesota, 236 F.3d 399, 405 (8th Cir. 2000)(finding that probationary and non-probationary employees are not similarly situated), cert. denied, 534 U.S. 816 (2001).

Shivers fails to show that E.B. and N.W. were similarly situated to him. He claims that E.B. was charged with falsification of documents pertaining to an entry in a log book. Rawls stated that E.B. was charged with falsifying a shakedown report soon after Shivers was charged with the same thing. Rawls claims that E.B. instructed him to sign the report and he and E.B. did so without doing the shakedown. Rawls Dep. 75-79. Prior to N.W.'s falsification of document corrective action (for which she received an eight-hour suspension), N.W.'s only prior written warning or corrective action was a written warning for reporting to work late. E.B., who received an eight-hour suspension for her falsification of a document, had no prior written warnings or corrective actions. See Defendant's Motion for Summary Judgment at 20, Gracien Aff., Exs. 14 and 15 (N.W. and E.B. Disciplinary Histories). In contrast, beginning with the February 2007 Sick Call List incident (for which Shivers was disciplined in May 2007), Shivers committed six rule violations (two of which, the pepper spray canister and the Gibson leave incident, were combined into one for disciplinary purposes) in a less-than two year period.[12] See, e.g., Mahomes v. Potter, 590 F.Supp.2d 775 (2008)(finding that the

---

[12]SCDC policy governing employee corrective actions provides a progressive discipline scheme, under which repeated rules violations by an employee can lead to a more severe corrective action. In determining the corrective action to be taken against an employee for misconduct, factors to be considered include the employee's work history, previous disciplinary history performance appraisals, whether the action was intentional or inadvertent, and whether the action jeopardized the safety, security, or mission of the institution. Written warnings are considered for two years and other corrective actions are considered for three years from the effective date of the corrective action. See Gracien Aff., Paras. 12-15; Ex. 7 (SCDC Policy ADM-11.04).

disciplinary history of comparable employees was not similar where the comparator had not been disciplined for over two years before he was given a written warning for the same violation for which Mahomes was terminated where Mahomes had accumulated multiple suspensions in the two years prior to her final misconduct).

      D.    <u>Harassment/Hostile Work Environment</u>

In his complaint, Shivers alleges that for more than two years he was "harassed threatened, demoted, vilified and subjected to a continuing racially hostile environment" by Preacher, Latta, and McKie. Complaint, Para. 8. In his opposition memorandum, Shivers asserts he was subjected to a hostile work environment because he was subjected to engineered and trumped up charges, racially based statements, threats from his supervisors, less favorable treatment than black or female officers, and harsher discipline. Plaintiff's Opp. Mem. at 14. SCDC argues that Shivers cannot establish a hostile work environment claim because the alleged behavior is not sufficiently severe or pervasive to create a hostile work environment. Additionally, SCDC argues that the statements alleged and the use of the term "white" were not inherently pejorative.

To prevail on a Title VII hostile work environment claim based on sex or race, a plaintiff is required to present evidence establishing that "(1) the subject conduct was unwelcome; (2) it was based on the [sex or race] of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer." <u>Spicer v. Virginia Dep't of Corrs.</u>, 66 F.3d 705, 710 (4th Cir.1995) (en banc); <u>see also</u> <u>Mosby-Grant v. City of Hagerstown</u>, 630 F.3d 326, 334 (4th Cir. 2010); <u>Ocheltree v. Scollon Prods., Inc.</u>, 335 F.3d 325, 331 (4th Cir. 2003) (en banc).

24

Shivers fails to establish a hostile work environment claim based on sex because he fails to show that the alleged harassment was based on his sex.  He fails to establish a hostile work environment claim based on sex and/or race because he has not shown that the alleged harassment was sufficiently severe or pervasive to alter the conditions of his employment and to create an abusive work environment.

At most, Shivers alleges that Preacher made the statement to Shivers that Shivers only talked to white people and only hung out with white people (Shivers Dep. 114-115), Preacher called Shivers "boy" in front of other employees at roll call on one occasion (Shivers Dep. 116), and Preacher repeatedly referred to him as "white Shivers" to distinguish him from a black employee on the same shift with the last name Shivers (Shivers Dep. 118).  While such comments by a supervisor are inappropriate, they fail to reach the level of severe or pervasive.

In Faragher v. City of Boca Raton, 524 U.S. 775 (1998), the Supreme Court reaffirmed its previously articulated standard for determining when a plaintiff has established a hostile work environment in violation of Title VII, stating a plaintiff must establish that the environment was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher, 524 U.S. at 787 (citing Harris v. Forklift Systems, Inc., 510 U.S. 17, 21-22(1993)).  Actionable harassment occurs when the workplace is "permeated with discriminatory intimidation, ridicule, and insult." Harris, 510 U.S. at 21.  Here, the alleged conduct does not rise to this level.  See Robinson v. Montgomery Ward and Co., Inc., 823 F.2d 793, 797 (4th Cir.1987), cert. denied, 484 U.S. 1042 (1988)("occasional or sporadic instances of the use of racial or ethnic slurs in and of themselves do not constitute acts of racial discrimination."); Snell v. Suffolk County., 782 F.2d 1094, 1103 (2d Cir. 1986) ("To establish

a hostile atmosphere, ... plaintiffs must prove more than a few isolated incidents of racial enmity");

Johnson v. Bunny Bread Co., 646 F.2d 1250, 1257 (8th Cir. 1981) (no violation of Title VII from

infrequent use of racial slurs).

     E.    Retaliation

Shivers alleges that SCDC retaliated against him for filing an internal harassment/hostile

environment claim on April 14, 2008,[13] with his earlier incident report outlining Preacher's comments

attached.  SCDC argues that Shivers cannot establish a prima facie case of retaliation as he did not

engage in protected activity and there is no causal link between any purported protected activity and

the alleged adverse actions.

To establish a prima facie case of retaliation under Title VII, an employee must demonstrate

that:

    1)    the employee engaged in protected activity;[14]

    2)    the employer took some adverse employment action against the employee; and

    3)    a causal connection existed between the protected activity and the adverse action.

See Haulbrook v. Michelin North America, Inc., 252 F.3d 696, 706 (4th Cir. 2001)(ADA); Causey

v. Balog, 162 F.3d 795, 803 (4th Cir. 1998)(ADEA and Title VII); Carter v. Ball, 33 F.3d 450, 460

---

[13]On page 15 of his opposition, Shivers asserts that he engaged in protected activity when he filed the internal harassment claim on March 14, 2008.  This appears to be a typographical error, as the complaint is dated April 14, 2008, and it refers to a meeting held March 20, 2008.  See Gracien Aff., Ex. 17

[14]Under Title VII, a plaintiff need not have filed a formal complaint with the Equal Employment Opportunity Commission or a state deferral agency to engage in a protected activity. Complaints to supervisory or management employees concerning harassment or discriminatory treatment as well as informal complaints, filing of internal grievances, and complaints to an agency are included within the definition of protected activity.  Warren v. Halstead Indus., Inc., 802 F.2d 746, cert. denied, 487 U.S. 1218 (1988) and Mitchell v. Baldrige, 759 F.2d 80 (D.C. Cir. 1985).

(4th Cir. 1994)(Title VII).  If the plaintiff establishes a prima facie case, the burden shifts to the

defendant to produce evidence of a legitimate, non-discriminatory reason for the adverse action.

Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981).  If the defendant meets this

burden, the plaintiff must show by a preponderance of the evidence that the proffered reason was

pretextual.  Reeves, 530 U.S. at 147 (2000).

(1)     Protected Activity

Shivers alleges he engaged in protected activity by filing an internal

harassment/hostile work environment claim on April 14, 2008, which had his earlier incident report

outlining Preacher's comments attached.[15]  SCDC argues that this cannot be protected activity for

the purposes of a Title VII retaliation claim because it was not based on an objectionably reasonable

belief that a Title VII violation occurred.  Additionally, SCDC argues that Shivers' internal complaint

was filed in response to the punishment of him for his misconduct and was an attempt to shield

himself from corrective action rather than to assert a legitimate grievance.

To constitute "protected activity," a plaintiff must  reasonably believe that the employment

practice is unlawful.  Jordan v. Alternative Resources Corp., 458 F.3d 332, 338 (4th Cir. 2006).

Because such an analysis is "an objective one, the issue may be resolved as a matter of law."  Id. at

339.

Here, Shivers fails to show that his internal harassment claim on April 14, 2008 is protected

activity for the purposes of his retaliation claim.  The comment on the internal complaint is that

Preacher made a racial statement toward Shivers.  The internal complaint incorporates Shivers'

---

[15]The parties agree that the Sick Call List is not protected activity.  See Defendant's Motion
for Summary Judgment at 26, Plaintiff's Opp. Mem. At 15.

March 20, 2008 incident report by reference, which asserts that Preacher made a racial comment in stating that "you [Shivers] don't hang out with anybody, or talk to anybody, other than white people." Gracien Aff., Ex. 17. Where a retaliation claim is based on the employee's complaints about a hostile work environment, a single incident is insufficient to create a "an objectively reasonable belief" that a violation of Title VII was actually occurring.  Jordan v. Alternative Resources Corp., 458 F.3d at 341. Such a principle exists because such complaints do not involve even a discrete adverse employment action.  Generally, "only after an accumulation of discrete instances of harassment" can such conduct rise to the level of an unlawful employment practice.  Id. at 339.

(2)     Causal Connection

Shivers alleges there is a causal connection between his complaint and demotion because the alleged hostile and discriminatory treatment increased after he filed the complaint, he was threatened by Latta, and several engineered and trumped up charges (in which Preacher was involved) occurred in a time period of only four months. SCDC argues that there is no causal connection because the alleged discriminatory conduct started in May 2007 after the Sick Call List, and Plaintiff's own misconduct continued after the filing of his internal complaint.  Additionally, SCDC argues that there is no causal connection because there is no evidence that Preacher or Latta knew about the complaint.

Shivers fails to establish a causal connection between his internal charge and his demotion. He has not shown that Latta or Preacher knew of the internal charge.  See Clark County School Dist. v. Breeden, 532 U.S. 268, 273 (2001)(no causal connection where there was no indication that an employee's supervisor knew of the right-to-sue letter when the alleged adverse action was proposed).

28

Latta and Preacher testified that they never saw the internal complaint prior to the filing of this lawsuit.  Preacher Dep. 103-104; Latta 66.

        (3)      <u>Legitimate/Nondiscriminatory Reason/Pretext</u>

Even if Shivers can establish a prima facie case of retaliation, SCDC has articulated legitimate, nondiscriminatory reasons for its actions which Shivers fails to show are pretextual, as discussed in relation to Shivers' disparate treatment claim above.

<u>**CONCLUSION**</u>

Based on the foregoing, it is recommended that Defendant's motion for summary judgment (Doc. 27) be **granted**.

Joseph R. McCrorey
United States Magistrate Judge

September 1, 2011
Columbia, South Carolina

29